THE FIRST NATIONAL BANK OF SHAMROCK, TEXAS, RESPONDENT, v. WITHERSPOON LIVESTOCK COMMISSION COMPANY, A CORPORATION, ET AL., DEFENDANTS, SHAMROCK COTTON OIL CO., A CORPORATION, APPELLANT.—90 S. W. (2d) 453.

Kansas City Court of Appeals. January 6, 1936.

*Morgan, Culton; Morgan & Britain* and *Ringolsky, Boatwright & Jacobs* for respondent.

*H. B. Hill, Farrar & Phillips* and *Floyd E. Jacobs* for appellant.

BLAND, J.—Defendants are livestock commission merchants in Kansas City and as such they sold certain cattle, the proceeds of which aggregate the sum of $4,118.63. This suit was brought against them by plaintiff for said sum of money, based upon two chattel mortgages owned by the plaintiff upon the cattle so sold. The defendants filed separate answers admitting that they had said sum of money in their hands from the sale of said cattle but setting up that the same was claimed by both plaintiff and the Shamrock Cotton Oil Company, Inc. Defendants offered to pay the money into court and prayed that the plaintiff and the oil company be required to litigate their respective claims to the fund. The prayer of the defendants was granted, resulting in the money being paid into court and defendants discharged. The Shamrock Cotton Oil Company interpleaded, basing its claim to the fund on the ground that it had an agister's lien upon the cattle in question. The court rendered judgment in favor of the plaintiff for the entire fund. Interpleader has appealed.

The facts show that, in the summer and fall of 1932, one Earl George owned a large ranch near the city of Shamrock in Wheeler

County, Texas, where he held 408 steers which he owned and desired to fatten for the market; that prior thereto, or on March 15, 1932, he executed two notes in favor of the plaintiff, aggregating the sum of $10,305.73. To secure the payment of this indebtedness, on said day, he gave plaintiff a first mortgage on 284 of said cattle upon said ranch. On said date he also gave to O. P. Jones, doing business as the O. P. Jones Loan Company, a second mortgage on these same 284 cattle, together with a first mortgage on the other 124 head of cattle upon his ranch and owned by him, to secure the latter's note in the sum of $10,038.39. All of these notes were to become due on September 1st of that year and were renewals of other renewal notes covering the balance of funds that had originally been advanced by the mortgagees to George for the purpose of buying the cattle in controversy. Both mortgages contained clauses to the effect that the cattle were to be fed by the mortgagor at his own expense. The note given Jones, on March 15, 1932, was sold by the latter to the First National Bank of Fort Worth, Texas.

The facts further show that interpleader was engaged in the cotton oil business with its plant in Shamrock, Texas; that it produced cotton seed products consisting of cake, meal, oil, lint and hulls. It maintained feeding pens at its plant in Shamrock where as many as 2000 head of cattle could be fed at one time. Primarily the pens were maintained for the convenience of interpleader's customers who bought cake, meal and hulls from it and fed them to the cattle in such pens. However, interpleader, itself, had been in the habit of feeding 100 to 200 head of cattle each year in its pens. It was the object of interpleader to dispose of its products at its own feeding pens and in the fall of each year when the cotton crop had been harvested to have the cattle brought into its pens to consume the feed manufactured by it. George had been buying feed from interpleader for years. At times he would feed such feed to his cattle in interpleader's pens and sometimes he would feed them in his own pens, which were close to the former's pens.

In the fall of 1932 the interpleader and George entered into a different ararngement than had ever existed between them theretofore. This was what is referred to as a ''gain in weight'' contract, which was executed in writing on September 14, 1932. By this contract interpleader agreed to feed 406 head of George's said cattle, the former to furnish the feed pens, feed, water, salt and all necessary labor in feeding and caring for the cattle until such time as they were ready for market. Before being fed they were to be weighed at the railroad pens and, after deducting three per cent from their weight for shrinkage, the resultant was to constitute the aggregate weight of the cattle. It was agreed that interpleader was to receive, as compensation for the feeding and caring of the cattle, the ''gain or increase in weight between now and the time said

cattle are sold on the market.'' Four hundred seven cattle of the average weight of 1029 pounds were delivered, on September 15 and 16, 1932, by George to interpleader to be fed under said contract, all of which cattle were covered by the mortgages in question. The feeding contract was fully performed by the interpleader. Some of the cattle were marketed in January, 1933, and some in March of that year.

The note and chattel mortgage, that were sold by Jones to the First National Bank of Fort Worth, Texas, were assigned to the plaintiff on April 21, 1933, and prior to the bringing of this suit.

It is claimed by the interpleader that the two banks in question waived their liens in favor of interpleader's agister's lien and are estopped to claim their liens to be superior to its.

E. R. Tinsley, testifying for the interpleader, stated that he was manager of the interpleader; that on or about September 11th, he and George, at the latter's ranch, talked about feeding the steers in question; that George ''didn't seem to be able to feed the cattle himself'' and suggested that interpleader feed them on the ''gain in weight'' plan. Tinsley never before had fed cattle on such a basis and wanted time to study the matter. On his way back to Shamrock he called upon Mr. Koger, vice-president of the plaintiff bank, who was in active charge of its affairs. The witness testified that he knew that George conducted his banking business with the plaintiff bank and thought that the bank might have a mortgage on the cattle, but did not know, in fact, that it had any mortgage. He told Koger that he and George had been considering feeding the cattle on a gain-in-weight basis and Koger said: ''Well, it might be all right, I notice that is working out in various states, I notice where some packer over in Hall County is doing that, he said, 'I think Mr. George should give me a guarantee of price on the gain-in-weight,' and I think that was about the end of the conversation, only Mr. Koger said that might work out all right, and for George to come in and we will discuss it;'' that he reported this conversation to George; that September 11th was on Sunday and on the following Tuesday morning George came into Tinsley's office and they agreed upon the contract that they entered into; that the same day, after George left the office, the witness went to the bank and related to Koger the agreement that the witness had had with George and Koger said: '' 'What do you think these cattle will weigh?' I said, 'Well, the cattle I saw, I didn't see them all, but what I saw, I thought would weigh around a thousand pounds,' he said, 'Well, I don't think they are that good cattle;' that Koger asked him ''when he was to bring them in, and I said, 'Well, part of them on Thursday, and part on Friday;' '' that Koger said nothing to him about the existence of the chattel mortgages; that on the following Saturday, after the cattle were in the pens, the witness went to the bank

and told Koger that they were there; that the latter asked "me about the weight, and I told him what they weighed, 1029 pounds, I think they was, and he said, 'Well, they are much better cattle than I thought they were.' I said, 'Yes, they are pretty good cattle.'"

The witness further testified that Koger went to interpleader's pens and looked at the cattle on several occasions after this, but at no time did Koger mention the chattel mortgage, nor did he ask Koger if there was any in existence.

Two car-loads of the cattle were shipped to the Kansas City market in January, 1933, and sold. The witness testified that Koger, George and he talked about the cattle being ready for the market and it may be inferred from the witness' testimony that they all three consented that the two car-loads might be sold at that time. The witness testified that when the cattle were sold they brought a "destroying price;" that when the proceeds from the sale of the cattle were sent back to the plaintiff he asked Koger for interpleader's "part of the feed claim in the shipment and was turned down, and then is when the mortgage came out from under cover."

Koger told him that the feed bill was a matter between the witness and George; that it appeared that the proceeds from the sale of the cattle were not sufficient to pay, even the first mortgage; that about the time the first two car-loads of cattle were shipped out Koger came to see him and asked him to "waive our feed claim on the first few cars of the cattle, that he had some paper at Fort Worth he wanted to take up on the first shipment" and "he wanted me to waive the feed claim on the cattle, so that he could take care of this matter down there, and I told him I thought each shipment ought to take care of itself." When Koger refused to apply any of the proceeds of the sale of the cattle to interpleader's feed bill the witness protested and claimed that he was entitled to the "gain in weight of the cattle."

It appears that in January, 1933, the cattle no longer could be fed on the diet being furnished them by interpleader without serious injury to them and it was necessary, if not then sold, that they be fed corn. In fact interpleader had already started feeding them a diet of corn at least in part. The witness testified that Koger and George wanted him to agree to ship the cattle to Herington, Kansas, to be there fed corn and then marketed. Koger said: "'Let them go on up and them cattle will take care of our feed bill up there,' and I objected and I said, 'No, unless Mac here will guarantee us our feed claim without any argument, I am not going to let the cattle leave the pen;'" that the witness later agreed to let the cattle be shipped to Herington on certain conditions, not necessary for us to mention; that they were loaded out for shipment on January 24 or 25; that the cattle at that time were of an average weight of 1312 pounds; that there were 367 cattle shipped to Herington.

The witness further testified that Koger did not, at any time, object to interpleader having possession of the cattle and that it had not at any time received any money from the proceeds of the sale of any of the stock. It may be further stated that the cattle that were shipped to Herington, Kansas, were afterwards sold on the Kansas City market and it is the proceeds of this sale that is in controversy here, it being admitted that the amount in controversy represents the value of "the gain in weight" of the cattle.

On cross-examination the witness testified that September 11th was the first time he had ever talked to Koger about the cattle; that he first went to see Koger because he thought possibly the plaintiff had a mortgage on the cattle; that he did not care to find out whether plaintiff, in fact, did have a mortgage on the cattle but he wanted it to know what was taking place in reference to the cattle; that he did not want to know whether it had a mortgage; that he thought as a matter of law an agister's lien would come ahead of the lien of the mortgage if there was one; that he was, therefore, not interested in determining whether there was a mortgage on the cattle; that he thought it was none of his business; that he did not ask Koger to let interpleader's feed bill come ahead of the mortgage, "I figured the pounds we put on the cattle was ours;" that prior to the time the first two car-loads of cattle were shipped in January, 1933, he thought that interpleader's lien would come ahead of any mortgage, as a matter of law, and that he was, therefore, not relying upon anything that Koger told him in the matter of his action in feeding the cattle. "Q. You were relying upon what you believed your rights were, what you assumed the law was, is that correct? A. Yes, sir."

He further testified that the market price of the cattle dropped between September and the time the cattle in question were sold; that when he first learned there was a chattel mortgage on the cattle Koger told him that the mortgage would come first and that the matter of the payment of the feed bill was one between him and George; that when the second shipment of cattle took place Koger again claimed that the bank had a prior right to the proceeds of the sale of the cattle and told the witness to talk to Mr. Pendleton, who was president of the plaintiff bank. The witness testified that Mr. Pendleton took the same position that Koger had taken; that the witness refused to let the cattle be shipped to Herington, Kansas, unless the bank would guarantee his feed bill but that he had never asked the bank to allow the feed bill to become a lien ahead of the mortgages; that he refused to permit the cattle to go to Herington until the bank guaranteed the feed bill because Koger had told him that the bank did not consider the feed bill ahead of the mortgages; that the bank did not guarantee the feed bill.

The witness further testified that about the time the cattle came

into interpleader's pens he was leaving the city and he asked Mr. Griffin, treasurer of the interpleader, to go to the bank and let it know that the cattle were there.

Griffin, a witness for the interpleader, testified that he went to the bank and told Koger: "That I had asked Mr. George if there were any other interested parties who might have some objection to this deal, that we had entered into with him for feeding the cattle, and he told me that he didn't think so. I repeated that to Mr. Koger. And Mr. Koger said something to the effect that, 'George hasn't been around to see me yet;' " that Koger said nothing at that time or any other time about a chattel mortgage; that the witness did not know that there was one; that he did not know anything about the chattel mortgages until interpleader "failed to get its proceeds from the sale of the first cattle;" that he had asked George if there was any one who would object to the feeding arrangement because he wanted to find out if there "was anybody else who had liens on the cattle that would make any objection. Q. Did you ask George if there was any liens? A. No, sir." . . . "I wasn't trying to find out if there was a lien on the cattle, because, I didn't because that wasn't my business, but I wanted to know if there was anyone that would object. Q. You assumed that there was liens? A. Yes, I assumed the possibility there was. Q. Then when you went to see Mr. Koger, you assumed he had a lien on the cattle? A. I assumed he was most likely of anyone I know. Q. Did Mr. George tell you to go to Mr. Koger? A. No, sir. Q. Did he tell you Mr. Koger, or the First National Bank, was interpleader? A. No, sir." The witness further said from his conversation with Koger the witness understood that the latter had "no objection to offer to the deal;" that on March 15, 1933, he rendered interpleader's bill to the bank for $750, being the value of the feeding of the animals that had been shipped (to the market); that Koger told him: "I had presented a statement to the wrong party, that they had nothing whatever to do with it, that I should see Mr. George, and that I should expect payment from Mr. George;" that Koger told him that, while he had received the proceeds from the sale of the cattle, there had not been money enough to pay the mortgages; that Koger did not say to him that he had told Tinsley and George several times that the bank would not consent to any arrangement being made that would put the feed bill ahead of the mortgages.

He further testified that neither he nor Tinsley investigated the records to find out whether any mortgages were in existence. (The mortgages were duly recorded in Wheeler County at the time of their execution.) "Q. Why didn't you take his (George's) word so far as Mr. Koger was concerned? A. I wanted to know if Mr. Koger had any objections. Q. But you weren't interested in finding out what mortgages were on the cattle or who held them? A.

No, sir. Q. You just wanted to know what objections he had? A. I figured if George owed anybody, it would be Mr. Koger or the bank, and if there was any objection to be made the bank would make the objection.''

R. L. George, testifying for the interpleader, stated that, about the time the cattle were placed with the interpleader, he had a conversation with Koger and that the latter ''made the remark that he hoped it worked out all right;'' that there was no objection made by Koger at that time. He stated that he did not tell Tinsley or Griffin that there were any mortgages upon the cattle; that Griffin asked him ''if there was anyone who held a mortgage that would object to the trade. I told him I didn't think there were;'' that after the first two car-loads were marketed in Kansas City, Koger, Tinsley and the witness were in the bank and the witness remarked that he ''thought the bank would go ahead and take care of the obligations as they had before.'' ''Q. What, if anything, was said by Mr. Koger in reply to your statement? A. He said the bank could not take care of it. Q. Had you or not fed the cattle prior to this time on which the bank had mortgages? A. Yes, sir, I have fed cattle before that the bank had mortgages on. Q. What, if anything, was said or done in these prior transactions concerning the payment of the feed bill prior to the chattel mortgages? . . . A. I had most times before been able to take care of the feed bill myself. . . . Q. What, if any, objection had the First National Bank made to payment of feed bills prior to payment of the chattel mortgages held by it? A. The bank had never made any objection to any transaction prior to this. Q. I will ask you to state as to whether or not the custom was with you and the First National Bank of Shamrock, Texas, for you to make arrangements and feed the cattle and make payment of the feed bill on the mortgaged cattle without objection from said bank? A. It had been where necessary. Q. What, if any, transactions and trades had you made prior to this time with the Shamrock Cotton Oil Company, Inc., for feeding cattle? A. There weren't any trades before. I would buy their feed for the cattle that were fed.''

On cross-examination the witness stated that prior to the time the cattle were placed in interpleader's pens he had a talk with Koger about feeding them chopped corn on the witness' ranch but that Koger wanted him to sell the cattle to stockers or feeders and objected to him ''full feeding'' the cattle; that Koger said that the cattle should be sold them without incurring any additional expense but that Koger was agreeable to his feeding the cattle corn that he had bought; that he did not feed the cattle in question any corn that ''I had bought;'' that he talked to Tinsley the first time about interpleader feeding the cattle a few days after he had this conversation with Koger; that he did not tell Tinsley that the bank

had a mortgage on the cattle because Tinsley did not ask him; that prior to the cattle being removed to interpleader's pens he did not mention the matter to Koger or anyone connected with the bank; that he knew at the time they were removed to interpleader's pens that it was Koger's desire that the cattle be sold but he did not tell Koger "because I never had to go to Mr. Koger in such a case before." "Q. You stated, I believe that in all times prior to this you had always bought the feed yourself and paid for it? A. Most always;" that he saw Koger about two weeks after the cattle were removed to interpleader's pens; that he talked to Mr. Pendleton several times about feeding the cattle prior to the time they were removed to interpleader's pens and that "Mr. Pendleton was not in favor of feeding the cattle. Q. At the time you placed these cattle in the feeding pen of the intervenor you did not expect the First National Bank of Shamrock to buy the feed that was being fed them did you? A. No, I didn't expect the bank to pay for the feeding of these cattle because there was a good margin in the cattle at that time, and no one expected the market to work as low as it did. Q. It is your opinion then that if you had sold the cattle that you turned over to the intervenor for feeding at the time you turned them over to it that you would have realized enough money out of them to have paid the First National Bank of Shamrock in full and still have some money left? A. Yes, sir;" that at the time he talked to Koger about feeding the cattle the latter told him to talk to Mr. Pendleton about it as well as some of the other directors of the bank.

E. L. Koger, testifying for the plaintiff, stated that Mr. O. P. Jones, who owned the O. P. Jones Company, was president of the plaintiff's bank and that the witness was vice-president; that George had done business with the bank for many years and had many transactions with the bank and the O. P. Jones Loan Company; that the two chattel mortgages in question represented the balance that had been loaned to George to purchase the cattle in question; that the mortgage that was transferred to the First National Bank of Fort Worth was sold to it shortly after March 15, 1932, its date; that the other mortgage was at all times held by the plaintiff bank; that he had a conversation with George during the latter part of August, 1932; that George told him that there were 1500 bushels of corn on his farm that he wanted to feed to the cattle either in George's pasture or in his individual pens in Shamrock; that the witness told him "that we objected to feeding those cattle or going into any feeding arrangement on those cattle, due to the fact we want them sold, that the paper was due and we didn't want to put any money in them. He said he could buy that corn on his own responsibility and that the seller of the corn would carry him individually for the corn, and that by feeding that corn, when and

if a stocker buyer came along to see the cattle it would be a special inducement for that stocker buyer to bid on his cattle, and he only wanted to feed them for a short time, until he could find a buyer. I finally told him that it would be all right possibly to feed them that corn provided he bought the corn on his own responsibility and with the understanding that no lien would attach to the cattle on account of that corn, and further provided that the seller of the corn would come to the bank and enter into a written agreement to that effect, that that might be all right to do that;'' that he had a conversation with Tinsley, on September 5th, in Shamrock and Tinsley told him he had been talking to George ''about arranging to feed the cattle on a gain in weight proposition and we discussed it at great length, sat there a good long time and talked it over, and I explained to Mr. Tinsley that we didn't have sufficient confidence in the future fed cattle market and we doubted the advisability of going in to a feeding deal, also told him that Mr. George owed the bank considerable money and that the bank's debt was secured by a mortgage on the 284 head of those cattle and in addition to that Mr. George had a mortgage in favor of the O. P. Jones Loan Company for a considerable amount of money secured by a first mortgage on 124 head of the cattle and as additional security to that loan they held a second mortgage on the 284 head under the First National Bank mortgage, and that the Fort Worth bank wanted some money, had been insisting on its money, and that they didn't want to go into any arrangement like that to feed the cattle.'' . . . ''We discussed at length the program that was going on over the country at that time, folks were taking cattle in to feed on a gain in weight basis.'' ''Q. What, if anything, did he say about waiving the first mortgage lien at the First National Bank of Shamrock then held on 284 head of the cattle? A. He didn't say anything about any waiver nor of any mortgage lien. Q. Well, was anything else said at this conversation now? A. Yes, he said, well, that he had already talked this feeding proposition over with Mr. George and that Mr. George had been his good customer and good friend and had fed cattle for him in the years before and it was going to be embarrassing to him to go back and tell Mr. George he couldn't carry out this arrangement. I said, 'Mr. Tinsley, I can get that over for you easy enough, I will get you out of that. You have had this talk with Mr. George, now then if and when he comes back to talk to you about a definite and permanent arrangement let me suggest that you reduce your arrangement to writing and both of you sign it and then you say to Mr. George, Bob, this bank has a mortgage on these cattle and I suggest you take this contract down to the bank and get them to O. K. it.' '' . . . ''Q. What did you tell him if the contract was brought down to be O. K'd? A. Well, I would turn it down because we didn't want any more liens on the

cattle, anything that would interfere with our liens on the cattle, we wanted the cattle sold, we wanted our money.'' He further testified that such a contract was never brought to him; that the next time he talked with Tinsley or George was ''along the latter part of September;'' that when he talked to George at that time he learned that the cattle had been brought into Shamrock; that he thought that they had been put in George's pens to be fed with the corn that George and he had talked about; that he later learned that the cattle were in interpleader's pens. ''When I learned these cattle were in the oil mill pens I wondered where Mr. George was, why he hadn't said something to me, and on inquiry I found out he had gone out to Dimmit, Texas, where he has another property, and finally when he came back he came in there, in the bank, and told me, explained to me that he had these cattle out at the oil mill on the feed on a gain in weight basis.'' . . . ''He said he wanted to feed these cattle because both he and Mr. Tinsley thought that the fed cattle market was going to be better and that he felt like it would make him some money, he fully realized that this cattle or stockers were worth just about what he owed on them and he was hoping by feeding the cattle he could realize something out of the cattle for himself, and that Mr. Tinsley was anxious to feed the cattle and willing to make that arrangement with him, make that gain in weight feeding contract with him;'' that afterwards about the last of September he had a conversation with Tinsley who came to the bank; that he told Tinsley ''that I understood the cattle were out there and that I had never been presented with a contract to O. K., that he and I agreed on, and he explained to me he had to go away about that time, he had been away for quite a while, ten days or something like that, and that on his leaving that he had instructed Mr. Griffin along the line that we had talked, that is that Mr. Griffin was to reduce this agreement to writing in a form of contract, and that the mill and Mr. George was to execute the contract and then Mr. Griffin was to suggest to Mr. George that he take that contract to the bank on account of the mortgages and have the bank O. K. it. I told him that it hadn't been done. Mr. Tinsley then explained that when Mr. Griffin approached Mr. George about taking the contract to the bank Mr. George had said that it was all right with the bank to feed the cattle. Q. Well, what if anything, did you tell Mr. Tinsley? A. Well, as I told him in the other conversation. Q. Well, just relate now what you told him. A. It is unsatisfactory to us to feed the cattle, we don't want to enter into any feeding contract that will interfere with our liens on the cattle, we want the cattle sold and our debt paid. Q. What, if anything, did he say to that? A. Nothing more than as he had said before, except that the feeding of the cattle would make them bring more money.''

He further testified that Tinsley did not at this time, or in fact, in any conversation prior to this time, say anything about claiming any lien for the feed; that the next conversation he had with Tinsley was along in January, 1933; that George had been to the bank and wanted to send the cattle to Kansas to be fed ground corn. "And I explained to Mr. George that the cattle had been fed now longer than we had ever agreed or consented to, and that we didn't want to feed the cattle any longer;" that he told George that the arrangement might be all right but, knowing that it was the custom in Kansas, when cattle were sold on the market, that the feed bill "would follow in and be deducted from the gross proceeds of the cattle," he said to George that in the event the latter agreed with Tinsley to ship the cattle to Kansas it would be necessary for "outside arrangements to be made for those feeders up there;" that he told Tinsley this; that Tinsley appeared to be willing to ship the cattle to Kansas but "he objected to making any arrangement about the feed bill;" that he "wanted his feed bill at the mill paid before the cattle were moved." The witness explained to him that that was a matter between him and George and "I reminded him about our previous conversation." Mr. Tinsley finally said, "Well, that was a careless deal." He said because "I thought everybody would be willing to do the right thing about it." George thought that interpleader should have its money for its feed. The witness told him he could not pay it and told them to talk to Mr. Pendleton about it; that Pendleton "took the same position that I did." Tinsley wanted the bank to pay the feed bill. Nothing was said about interpleader's lien being superior to the mortgage held by the bank and Tinsley "didn't mention anything about any lien on the cattle;" that the bank finally consented to the cattle being shipped to Kansas and for the feed bill "up there" to be paid out of the proceeds of the cattle; that he had no further conversation with Tinsley; that he did not ask Tinsley to waive his lien but Tinsley "came to the bank and I told Mr. Tinsley I wanted to use this money as it came in and apply it on the debt down at Fort Worth, that those people wanted their money. He said that would be all right. Q. And was the money used for that purpose? A. Yes, sir."

In reference to his conversation with Griffin he testified that the only conversation he had with him was when he came to the bank and asked the witness "about a bill he had left at the bank on the George cattle and I told him the bank didn't know anything about that bill, he would have to see Mr. George about that. A. About when was that? A. That was in March. Q. What year, 1933? A. Yes, sir. Q. That was the first conversation you had with Mr. Griffin about these cattle or the feed bill connected with them? A. Yes, sir."

On cross-examination he testified that the proceeds from the first two car-loads of cattle were deposited in the Drovers National Bank in Kansas City to the credit of the plaintiff bank "for the use and benefit of R. L. George;" that the money was sent by the plaintiff to the First National Bank of Fort Worth to apply on its mortgage; that the Fort Worth bank's paper had been renewed on September 1st for sixty days; that the witness had explained to the Fort Worth bank "about the feeding deals," that is, the feeding of the cattle by the interpleader; that the Fort Worth bank instructed the witness to inspect the cattle and that he sent a man out to interpleader's pens for that purpose and to "take the brands, classify them as to weights and grades."

He further testified that he had been out to interpleader's pens two times to see the cattle; that he never demanded possession of the cattle from either George or Tinsley; that he did not tell Tinsley that the movement of the cattle was in violation of the mortgage. The witness testified that he saw the cattle in interpleader's pens in the latter part of September; that he did not make any objection to what had been done "Because I had had these conversations as stated, with both Mr. Tinsley and Mr. George, that we didn't want any liens on those cattle, and then when I found them there I naturally presumed Mr. Tinsley and Mr. George had made some trade of their own," and that in making this trade the two mortgages were recognized. He further testified that neither George nor Tinsley ever requested him to approve the contract that they had made for the feeding of the cattle.

W. S. Pendleton, testifying for the plaintiff, stated that he was president of the plaintiff bank; that he had two conversations with George sometime in August, 1932; that he told George "that those cattle were getting of an age where they ought to be sold, they couldn't afford to keep them any longer, and he must look for a buyer, and we didn't want those cattle fed and wouldn't stand for them being fed at the expense of the bank or any liens being put on them either, that they must either be sold to a stock buyer or shipped that fall, we didn't want them held over because the market was good at that time;" that he did not know of George's contract with the interpleader until after it was made; that at that time George told him that they were put in interpleader's pens on a gain in weight basis and he did not expect to keep them there very long; that the witness "reiterated my opinion that the cattle shouldn't be put on feed and warned him we didn't want any more expense put on the cattle in preference to our lien, we didn't want the cattle encumbered with any other liens and any deal he made with the oil company must be between him and the oil company, and not between the mill and the bank;" that at this time the cattle had been in the pens about three weeks; that when Tinsley contended that the feed

bill should be paid out of the proceeds of the first shipment of cattle he told him that he had warned George "that those cattle must not be fed there at that time, and my understanding of it was the deal was between them and he should look to George for his pay." Tinsley said he did not think it was right, that he had put his feed into the cattle and thought he should be paid. He made no statement that the bank had waived its lien but merely said he thought he was entitled to his money for the feed out of the proceeds of the cattle; that at the time he had this conversation with Tinsley, George and the latter had had conversations with Koger about the feed bill; that he had seen the cattle in interpleader's pen one time; that although the mortgage was due he never demanded possession of the cattle from either George or Tinsley; that he knew the "cattle were being fed at somebody's expense."

It is claimed by interpleader that the chancellor erred in ruling that the banks had not waived their liens in favor of its agister's lien and that they were not estopped to claim their liens to be superior to interpleader's.

Plaintiff insists that the written agreement entered into by George and intervenor, on September 14, 1932, was not a feeding contract but made the relationship between them joint adverturers. However, we may assume for the purposes of the case, that it was a feeding contract as claimed by intervenor.

The cause was tried under the Missouri law and it is well settled in this State that the lien of a prior valid recorded chattel mortgage will take precedence over a subsequently acquired lien of a livery stable keeper or agister on animals placed in his charge, unless such animals were delivered to the livery-stable keeper or agister to be kept and cared for by him with the consent of the mortgagee, express or implied. [Stone v. Kelley & Son, 59 Mo. App. 214; Lazarus v. Moran, 64 Mo. App. 239; Birmingham v. Carr, 196 Mo. App. 411; Miller v. Crabbe, 66 Mo. App. 660; Baskin v. Edmonston, 62 Mo. App. 515; Harding & Co. v. Kelso, 91 Mo. App. 607; Zahner Mfg. Co. v. Harnish, 24 S. W. (2d) 641, 643.] "If the mortgagee takes the mortgage with an understanding that the animals are to be kept by an agister for hire, his consent thereto will give the agister preference over the prior mortgage." [Cable & Reed v. Duke, 132 Mo. App. 334, 338.] The rule just stated has no application where the understanding between the mortgagor and the mortgagee is that no bill for feed is to be charged (Cable & Reed v. Duke, supra, l. c. 339), or where the livestock is in the stable or pasture of the mortgagor at the time of the execution of the mortgage and they did not pass into the hands of the agister until long afterwards. [Lazarus v. Moran, supra.] "The lien of a liveryman will be superior to that of the mortgagee under a prior chattel mortgage when the mortgagee consents to the mortgagor's leaving the animal in

charge of the liveryman, or, being notified that it has been so left, permits it to remain, expressly recognizing the right to a lien thereon." [11 C. J., p. 653. See, also, Miller v. Crabbe, supra; Robinson-Hoover Cattle Loan Co. v. Sifferman, 37 S. W. (2d) 974; Pickett v. McCord, 62 Mo. App. 467; Harding & Co. v. Kelso, supra.]·

The mere fact that the mortgagee does not object to the animals being kept by the agister does not constitute waiver on the part of the former. [Beh v. Moore, 124 Iowa, 564; The First National Bank of Mandan v. Scott, 7 N. D. 312; Bovard v. Owen, 30 S. W. (2d) 154.] But after condition broken the articles covered by the mortgage are regarded as the absolute property of the mortgagee, at least for the purpose of possession and foreclosure (Lange v. Midwest Motor Securities Co., 231 S. W. 272; Meyer Drug Co. v. Self, 77 Mo. App. 284, 293), and even though the mortgagee does not consent in the first instance to their placing by the mortgagor, in the hands of the agister for feeding if, while the mortgage is due and unpaid the mortgagee knows that they are being fed by an agister and goes to the latter's premises and examines the animals and makes no protest, an inference arises upon which a jury may find that he has waived his lien and is estopped to assert it. [Robinson-Hoover Cattle Loan Co. v. Sifferman, supra.]

It was stated in Pickett v. McCord, supra, l. c. 473:

"The proper rule of construction, we think, is to give the lien of the prior mortgage the preference, unless a contrary construction is unavoidable. . . . There are no equities in favor of the agister. The mortgage is on record, and he is presumed to have knowledge of its terms, and it is his own folly if he furnishes feed or pasturage for the mortgaged stock without first consulting the mortgagee."

"An agreement which will defeat the purpose of the transaction should not be inferred or implied against a mortgagee without very cogent evidence." [Lazarus v. Moran, supra, l. c. 241.]

After stating these well known principles of law, it is necessary to apply them to the facts in the case at bar. In reviewing the evidence we come to our own conclusion, as to the facts, this being an equitable proceeding. It appears that the following facts are undisputed:

That, at least up until the time the first of the cattle in controversy were shipped from Shamrock, Texas, to the market, when their feeding by the intervenor ended, neither of the banks in question were at any time asked by any one to waive the liens of their mortgages, or, was a lien of interpleader mentioned by anyone; that neither Koger nor Pendleton did at any time say that they would waive the liens of the banks and that no representative of intervenor ever at any time contended to Koger or Pendleton that interpleader had a lien superior to those of the banks, if any, at all; that the

cattle, covered by the two chattel mortgages, at the time they were taken to the pens of the interpleader by George were worth the amount of the indebtedness secured by the mortgages.

As to the facts in dispute, so far as the oral testimony is concerned, we are not in the favorable position occupied by the chancellor who tried the case, in that, he saw the witnesses and was in a better position than are we to judge of their credibility. Relative to this matter, it is well stated in the case of Hunnell et al. v. Zinn et al., 184 S. W. 1154, 1157, as follows:

"The rule is ancient and well settled that, even where upon the cold record on appeal the weight of the evidence may seem to us to be slightly against the finding of the chancellor, so that if left to ourselves we might have found otherwise, we will nevertheless defer to his findings, except in a plain case, where such finding is clearly erroneous. This, because of the chancellor's better opportunity to see and hear the witnesses."

Under the circumstances, we take the testimony of Koger and Pendleton to be true, insofar as their testimony conflicts with that adduced by the intervenor.

These facts tend to show that Koger, *in the beginning* objected to the cattle being fed by intervenor and that he particularly objected *at all times* to any arrangement for the feeding of the cattle that would result in the creation of a lien against them superior to that of the banks; that these objections were made to Tinsley at the time he first interviewed Koger in reference to the matter; that Koger continued to protest, not only to Tinsley, but to George, during the whole time that the cattle were being fed by the intervenor, that the banks did not want any lien placed upon the cattle that would be superior to the lien of the chattel mortgages.

There is much in the record indicating that Koger's testimony is true in respect to many of the material facts in controversy. In the first place there was no reason for the banks to waive their liens in favor of anyone. (Unless it could be said the desire to continue to collect interest is a reason but under Koger's testimony the banks, there is no doubt, preferred the cattle be sold.) When the cattle were put in interpleader's pens they were worth the amount of the mortgages. In addition to this, it will be remembered that both Tinsley and Griffith testified that they thought the plaintiff might have a mortgage on the cattle at the time they were removed to interpleader's pens. According to interpleader's testimony Tinsley had three conversations with Koger in reference to the matter and Griffin, at least one, and neither one of them inquired whether as a matter of fact, plaintiff did have a mortgage on the cattle and that Koger did not acquaint them of this fact, although Tinsley says, in effect, that he was careful to keep Koger advised as to what was transpiring between the witness and George relative to the cattle.

This testimony, no doubt was brought out by intervenor at the trial on the theory that it was thought it aided the claim of estoppel. Tinsley expressed great surprise, when the first cattle were shipped to the market, that Koger for the first time disclosed the fact that plaintiff had a mortgage on them. What purpose Tinsley and Griffin had in talking to Koger about the matter is not clearly defined in their testimony, except as to their statements that they thought plaintiff might have some interest as mortgagee in the cattle and was, at least, entitled to know what was taking place in reference to them. However, this explanation is hardly understandable in view of their testimony that a mortgage was never mentioned in the conversations. At any rate, intervenor is thus put in the difficult position of claiming a waiver concerning something that its witnesses claim was not even discussed.

It will be remembered that they testified that notwithstanding that they thought plaintiff might have a mortgage on the cattle, they did not ask Koger if such was the case and that Koger did not volunteer anything concerning the matter. There must have been some substantial reason for their talking to Koger. Under such circumstances, to ask the learned chancellor to believe that a mortgage was never mentioned was to challenge his credulity past the breaking point and we are not at all surprised that he found that their testimony, to say the least, should not be given conclusive effect in any material matter, especially in the face of Koger's testimony that the mortgages were mentioned. We are convinced, as no doubt the chancellor was, that the question of the mortgages was discussed between these witnesses in their conversations.

However, as to the question of estoppel, under the undisputed testimony, we must hold that there is none involved in this case. Both Tinsley and Griffin testified that in feeding the cattle interpleader was not interested in the matter as to whether there was a chattel mortgage upon the stock, but Tinsley said that he relied upon the belief that an agister's lien was superior to any mortgage lien that might exist. Not being concerned about mortgages they could not have been deceived by anything the banks or their agents did or failed to do concerning the matter. In order for there to be an estoppel it is necessary to show that one has relied upon the conduct of the person claimed to be estopped and has been misled to his prejudice or into an altered position. [Grafman Dairy Co. v. Northwestern Bank et al., 235 S. W. 435; Harding & Co. v. Kelso, supra, 1. c. 610, 611.] The evidence of Tinsley and Griffin shows that they were not misled by the fact that there was a chattel mortgage upon the animals and what the banks did relative to the same but, if they were misled, at all, it was through their mistaken knowledge of the law.

However, no doubt, intervenor is entitled to recover the fund by

showing that there was a waiver on the part of the banks of their chattel mortgage liens. From an examination of the cases having to do with questions of waiver of chattel mortgage liens in favor of those of agisters, we have found very few, if any, where the agister has been given preference in the absence of the element of estoppel. As compared to estoppel waiver is based upon relatively tenuous grounds. Waiver is defined to be an intentional relinquishment of a known right. [See 21 C. J., pp. 1115, 1116.] The question, therefore, to be determined here is whether there was an intentional relinquishment, on the part of the banks, of the superior liens of their chattel mortgages.

There is no claim by intervenor of any express waiver of the mortgage liens by the banks. Their case is grounded on implied waiver, only. It is true that at the time of the removal of the cattle to interpleader's pens the mortgages were past due and that, while the stock was being fed therein, they were renewed by the banks. It is also true that the condition in the mortgage given to Jones was broken by the removal of the cattle from George's ranch. However, there was no breach by such removal of the cattle of any of the conditions in the mortgage given to the plaintiff. The record is not clear which cattle covered by these mortgages produced the fund now in controversy but, at any rate, the condition of the mortgages had been broken by the failure of George, the mortgagor, to pay the debt past due at the time of the removal of the cattle to interpleader's pens. The fact that the holders of the mortgages were the owners of the cattle at that time, at least, for the purpose of taking possession and foreclosing their liens, and that they did not take advantage of these rights conferred upon them by the law when they could have done so at the time they found out that the cattle were being fed by the intervenor, shows that they, in a sense, did not object to the cattle being so fed. Agisters' liens take precedence over that of chattel mortgages when the mortgagee has consented, expressly, or impliedly, or has *acquiesced* in the feeding of the stock. [See Zahner Mfg. Co. v. Harnish, 24 S. W. (2d) 641, 643.]

However, the failure of the banks to object to the feeding of the cattle by intervenor in this case is not equivalent to consent or acquiescence. While the conditions of the mortgages were broken at the time the cattle were removed to intervenor's pens for feeding and the banks had the right to take possession of the cattle and dispose of them, there is nothing in the law that required them to do so and, undoubtedly, they had the power to waive that right under all of the circumstances. They did not take possession but renewed the mortgages. Therefore, the legal relationship between George and the banks at all times remained that of mortgagor and mortgagee at least insofar as the rights of third parties were concerned.

It will be borne in mind that there was no reason whatever for

the banks, from their standpoint, to consent to the further feeding of the cattle in controversy. (Unless to collect interest and this in effect was denied by Koger.) At the time they were removed to interpleader's pens they were then worth the full amount of the indebtedness against them. A fair consideration of Koger's testimony, taken together with the fact that the banks could have taken possession of the cattle and sold them on the ground that the condition in the mortgage, relative to the payment of the debt secured, had been broken, shows that while *in the beginning* he was opposed to the further feeding of the cattle, ultimately, while the banks preferred that the cattle be sold, they were willing for George and intervenor to enter into an agreement; between themselves, that might result in profit to those two, provided the liens of the banks should not thereby be prejudiced in any respect. Under such circumstances it would be very unusual to say that the banks either impliedly or expressly consented or acquiesced in a course of dealing between George and intervenor that resulted in the liens of the banks becoming inferior to that of intervenor. Of course, circumstances might be imagined under which one, who has a superior lien, may be held, by reason of his acts and conduct, to have waived that lien in favor of an inferior one although he may, at the same time, insist that he is not making such a waiver. We are not now dealing with such a case.

If no other facts were present, in the case at bar, except that the cattle at the time when the condition in the mortgages had been broken, were taken and fed by intervenor with the knowledge of the banks, without any objection made upon their part, no doubt it could be inferred that the liens of the banks had been waived in favor of intervenor's agister's lien and would be sufficient facts upon which the trier of the fact could arrive at the conclusion, that they had, in fact, been waived. (However, these facts would more properly give rise to estoppel rather than waiver.) If such had been the sole facts the case of Robinson-Hoover Loan Co. v. Sifferman, supra, and similar authorities cited by intervenor, would be in point. However, as before stated, there is much more than that in the present case. There was evidence tending to show that Koger, at all times, insisted to the agents of the intervenor that the banks would not waive their liens and yet it went ahead and fed the cattle. Under the circumstances no court would be justified in saying that the banks intentionally relinquished their superior liens within the meaning of the waiver as we have defined it.

Some mention is made of the testimony of George that it had been his custom to enter into feeding contracts with others without objection from the plaintiff. George's testimony is not very clear on this point, but assuming that plaintiff did permit him to do so in former instances, this would not require it to do so in this instance.

[Harding & Co. v. Kelso, supra.] If George's evidence on this point was admissible at all it was only to show the likelihood that the plaintiff consented also in this instance.

Intervenor makes much of Koger's testimony where he said: "I explained to Mr. George that the cattle had been fed now longer than we had ever agreed or consented to; that we didn't want to feed the cattle any longer." It is claimed that Koger thus consented to the feeding of the cattle. This conversation was had ·in January after the feeding of the cattle by intervenor had come to an end. We do not construe this testimony in the light claimed by intervenor. Koger had consented, at least conditionally, that the cattle be fed corn by George. The fact that his testimony might indicate that he had, at one time, consented to their feeding by George, does not necessarily mean that he consented to their feeding by intervenor. In fact, taking all of his testimony, it shows conclusively that he did not consent, at least insofar as waiving the liens of the banks was concerned.

It is also claimed that the evidence shows that what Koger objected to was a lien that would interfere with that of the banks and not that arising under a gain in weight contract. It is impossible to divide up the weight of the cattle in·this respect. The banks either had liens upon the entire weight or none at all under any reasonable version that can be taken of the testimony.

It would appear that this is merely a case where the banks represented by Koger, were willing, upon the request of the intervenor, to permit George and intervenor to speculate upon the future market for fat cattle, so long as their liens were not prejudiced. The banks, themselves, had no interest in feeding the cattle further (except possibly to collect interest but this in effect was denied by Koger), as the cattle were worth the debt·at the time the feeding began. The undisputed testimony shows that the market dropped and it thus appears that intervenor's venture proved unprofitable. The banks, under all of the circumstances, should not be required to shoulder any part of its loss.

The judgment is affirmed. All concur.